NOT RECOMMENDED FOR PUBLICATION
File Name: 21a0266n.06

Case No. 20-1779

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

FILED
Jun 02, 2021
DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | |
| v. | ) | ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF MICHIGAN |
| | ) | |
| ALLANTE WILLIAMS, | ) | |
| Defendant-Appellant. | ) | |
| | ) | |

BEFORE: SUTTON, Chief Judge; McKEAGUE and DONALD, Circuit Judges.

**BERNICE BOUIE DONALD, Circuit Judge**. Allante Williams appeals the revocation of his supervised release and resulting 24-month prison sentence. At his revocation hearing, the district court concluded that the government demonstrated by a preponderance of the evidence that Williams committed two armed robberies while under supervised release. Williams contends that the district court erred by considering unreliable witness identifications in assessing whether the government met its burden. For the following reasons, we **AFFIRM**.

I.

In 2015, Allante Williams ("Williams") pled guilty to one count of conspiracy to commit credit union robbery, in violation of 18 U.S.C. §§ 371 and 2113(a); and one count of credit union robbery, in violation of 18 U.S.C. § 2113(a). The district court sentenced Williams to 60 months' imprisonment on each count to be served concurrently. The district court also imposed a three-

year term of supervised release. On May 24, 2019, Williams was released from prison and began his term of supervised release.

On December 26, 2019, Mark Burchell ("Burchell"), a United States probation officer, filed a petition for revocation of Williams' supervised release, alleging that Williams violated six conditions of his supervised release. The petition alleged the following violations: (1) commission of an assault on November 28, 2019; (2) failure to report to Burchell on December 12, 2019; (3) failure to truthfully answer Burchell's questions during an in-home visit on December 10, 2019; (4) failure to notify Burchell within 72 hours of being arrested or questioned by law enforcement; (5) failure to maintain legitimate full-time employment; and (6) failure to pay restitution.

On January 2, 2020, Williams was charged in Michigan state court with armed robbery and weapons-related offenses that stemmed from multiple alleged robberies in Hamtramck, Michigan on December 30, 2019. On January 24, 2020, the state trial court held a preliminary hearing on these offenses. The three victims of the robberies and the two police officers who apprehended Williams testified at that hearing. The court found that probable cause existed for the cases to be bound over for trial, which has yet to occur.

On February 7, 2020, Burchell filed an amended petition for revocation of Williams' supervised release, adding a seventh violation that incorporated the state charges from the December 30, 2019 robberies. That violation was a Grade A violation, while violations one through six were Grade C violations. *See* USSG § 7B1.1(a)(1).

The district court conducted a two-day revocation hearing on July 28, 2020 and August 6, 2020. Williams admitted to violations two through six but asserted his Fifth Amendment right to

remain silent as to violations one and seven. The district court then proceeded with an evidentiary hearing as to those two violations.[1]

In support of its allegations that Williams committed armed robberies (violation seven), the government primarily relied on the preliminary hearing transcript, which provided the following information: On December 30, 2019, between 9:30 and 9:45 p.m., Williams and Larry Bailey ("Bailey") robbed a 14-year-old—"S.S."—and a 17-year-old—"A.T."[2]—while the two were walking through an alley in Hamtramck, Michigan. S.S. and A.T. testified that a blue Chevy Trailblazer stopped near them and that two men got out of the vehicle and pointed long guns at them, ordering S.S. to turn over his belongings. S.S. and A.T. each identified Williams as wearing a reflector-type vest. S.S. turned over his cell phone and six dollars in cash, while A.T. ran away from the scene to a street corner at the end of the alley. Williams and Bailey then fled in the SUV. S.S. testified that the entire incident took place in "about two minutes." A few minutes after the incident, A.T. and S.S. found each other, and the two of them reported the robbery to a police officer who was stopped nearby.

Around 10:15 p.m. that evening, Goyas Miah ("Miah") was exiting his commercial van in Hamtramck when Williams and Bailey, both armed with long guns, approached him. Miah testified that Williams and Bailey told him to put his hands up and not move and then took his cell phone, about $600 in cash, and the keys to the van. Miah then called the police with a friend's phone.

---

[1] As to violation one, the district court concluded that the government demonstrated by a preponderance of the evidence that Williams committed an assault on November 28, 2019. However, Williams does not appeal the district court's conclusions or factual findings as to that violation.

[2] Because S.S. and A.T. were minors at the time of the alleged robberies, the Court will identify them by their initials throughout this opinion.

At about 11:30 p.m., Hamtramck police officers were patrolling the city looking for a dark-colored Trailblazer that had been reported to be involved in armed robberies. The officers saw a matching SUV and observed the license plate to be expired. They initiated a traffic stop, and the SUV pulled into a nearby gas station. Williams and Bailey were seated in the front compartment of the SUV. During the encounter, the police officers observed two long guns, both in the front seat compartment along the center console. One of the guns was on the front driver's console, and the other gun was on the front passenger side console. Both guns were fully loaded.

After securing Williams and Bailey, the police officers transported Miah to the gas station, which was only a few blocks away from where he was robbed. Miah observed the police remove Williams and Bailey one at a time from the police car before he identified each of them. One of the police officers also recovered a set of keys from between the front passenger seat and the center console of the SUV. Miah identified the keys as his.

At the preliminary hearing, all three victims—S.S., A.T., and Miah—made in-court identifications of Williams as one of the robbers. A.T. testified that he was "100%" sure of his identification of Williams as one of the robbers, Miah identified Williams as one of the robbers who "point[ed a] gun" at him, and S.S. also positively identified Williams. Additionally, Miah provided testimony regarding his on-scene identification of Williams.

At the revocation hearing, Williams claimed that S.S.'s identification of Williams was unreliable, because S.S. inaccurately described Williams as having "light brown skin and freckles[,]" when Williams has neither of those features. Williams also argued that Miah's on-scene identification of Williams was unreliable because the technique used by the police was suggestive and that the government could not otherwise prove by a preponderance of the evidence that Williams had committed armed robberies.

In order to more thoroughly evaluate S.S.'s testimony, the district court asked the probation department to obtain mug shots of Williams and Bailey. The district court explained its interest in reviewing the photos as follows:

> It's obvious that a crime was committed in the alley. It's obvious a crime was committed at the, was it a gas station where Miah was assaulted. It's obvious that it was armed robbery. It fits all the definition of criminal behavior and it's an extremely serious event. The only question that lingers to any extent is the solidity of the eyewitness identification. And in aid of that, I would like this additional information found and presented.
>
> Again, I do not say here that the appearance of the individuals on the, on or about the day in question, freckles or otherwise, darkness of skin tone or the absence thereof is dispositive. It is simply a matter of evidentiary interest that I would like to have presented. And we will reconvene and see where any of this, all taken together, leads us.

Burchell then obtained Michigan Department of Corrections ("MDOC") photos for Williams and Bailey. Burchell also presented an intake photograph of Williams from his initial appointment with probation in May of 2019. In the photograph, Williams is wearing a jacket with reflectors on it.

After reviewing the photographs, the district court rejected Williams' arguments. The district court found that S.S. may have meant freckles to refer to "acne scars or discolorations" and that S.S. might have been attempting to state that Williams was a lighter skin color when compared to Bailey, not that Williams was actually "light-skinned." For those reasons, the district court concluded that S.S.'s in-court identification of Williams was reliable. Further, given the other witness identifications and the fact that the police found Miah's keys in the vehicle in which Williams was arrested, the district court found that "there [was] sufficient evidence to hold [] Williams responsible" for the armed robberies and concluded that Williams had committed a Grade A violation of the terms of his supervised release.

Williams argued for a Guideline sentence of six to twelve months because he had admitted to the Grade C violations. The district court rejected Williams' request and imposed a sentence of 24 months in prison with no supervised release to follow.

This appeal followed.

## II.

We review a district court's revocation of supervised release for an abuse of discretion, its factual findings for clear error, and its legal conclusion *de novo*. *See United States v. Kontrol*, 554 F.3d 1089, 1091–92 (6th Cir. 2009). The district court may revoke a term of supervised release if it finds "by a preponderance of the evidence that the defendant violated a condition of supervised release." 18 U.S.C. § 3583(e)(3); *see also United States v. Givens*, 786 F.3d 470, 471 (6th Cir. 2015); *United States v. Webb*, 30 F.3d 687, 688–89 (6th Cir. 1994). In considering whether the evidence meets that standard, the district court considers "the totality of the evidence presented, including circumstantial evidence and inference." *United States v. Lewis*, 790 F. App'x 702, 708 (6th Cir. 2019) (citing *United States v. Garcia*, 758 F.3d 714, 718–19 (6th Cir. 2014)). Revocation hearings are "more flexible than a criminal trial," and courts may rely on hearsay that is proven to be reliable. *United States v. Stephenson*, 928 F.2d 728, 732 (6th Cir. 1991). "Ordinarily, we will not reweigh the evidence presented in a sentencing hearing, nor will we evaluate the credibility of witnesses—it is sufficient that the district court's decision was consistent with the record as a whole." *United States v. Coleman*, 709 F. App'x 802, 804 (6th Cir. 2017). "If the government proves the violation, the period of incarceration is determined by the grade level of the violation, as set by USSG § 7B1.1." *United States v. Williams*, 473 F. App'x 481, 484 (6th Cir. 2012).

III.

Williams argues that the evidence was insufficient to prove that he violated the conditions of his supervised release. Specifically, Williams focuses on Miah's on-scene identification and S.S.'s in-court identification, contending that they were unreliable and that the district court erred by considering them in assessing whether the government met its burden. We disagree.

First, Williams contends that the district court should not have considered Miah's on-scene identification of Williams because it was the product of a suggestive show-up. Although Williams contends that this technique was improper, we have held that on-the-scene show-ups are not always unnecessarily suggestive. *See, e.g.*, *United States v. Craig*, 198 F. App'x 459, 467 (6th Cir. 2006) (holding that a victim's identification less than twenty minutes after the defendant's arrest was not unduly suggestive because the victim viewed the defendant's face, gave an accurate description of the defendant to the police, and did not hesitate when identifying the defendant); *Stidham v. Wingo*, 482 F.2d 817, 818–19 (6th Cir. 1973) (finding that a "show-up" identification was permissible where the victim was immediately brought to the scene of the arrest and positively identified the defendant).

Here, less than 45 minutes after Miah was robbed, the police brought him to the gas station where they had detained Williams and Bailey, two blocks from where Miah had been robbed. The police told Miah that they had caught two suspects and asked if Miah would confirm that they were the individuals who robbed him. After the police individually removed Williams and Bailey from the police car, Miah confirmed to the police that they were, in fact, the assailants. Williams has not identified any particular facts to indicate that this technique was unduly suggestive, and we therefore conclude that Miah's identification was reliable. Furthermore, even if the police had violated Williams' constitutional rights by using this technique, it would not bear on the

admissibility of Miah's on-scene identification, because "as a general matter, the exclusionary rule is inapplicable to probation or supervised release revocation proceedings[.]"  *United States v. Blackshear*, 1 F.3d 1242, at *4 (6th Cir. 1993) (unpublished table decision).

Second, Williams argues that the district court should not have considered S.S.'s identification of Williams, because Williams does not have "light brown skin and freckles," as S.S. suggested he did at the preliminary hearing.  However, a more thorough reading of the preliminary hearing transcript reveals that S.S.—who was only 14 years old at the time in question—might have confused "freckles" with beard stubble:

| | |
|---|---|
| PROSECUTOR: | Okay.  And the other person, what about their build?  The one that got out of the passenger side. |
| S.S.: | Same thing a little bit, but with like freckles. |
| PROSECUTOR: | Excuse me, what did you say? |
| S.S.: | Freckles around like -- |
| THE COURT: | So, Mr. [S.S.], you're gesturing with your hand, okay. |
| S.S.: | Sorry. |
| THE COURT: | I know what you mean, you're gesturing to like a goatee or beard -- |
| S.S.: | Yeah. |
| THE COURT: | But this is being recorded and then it'll be typed up. |
| S.S.: | I'm sorry. |
| THE COURT: | So you have to describe everything, not just gesture to it, okay? |
| S.S.: | Okay. |
| S.S.: | Yeah, he had like freckles on his beard. |
| PROSECUTOR: | Freckles on his beard? |
| S.S.: | I don't know, like dots. |
| PROSECUTOR: | But the person had a beard? |
| S.S.: | Yes. |

| | |
|---|---|
| PROSECUTOR: | Are you talking about different color hair? |
| S.S.: | No, no, no. It was like a regular beard, like regular-. |
| PROSECUTOR: | Yeah. |
| S.S.: | But like -- |
| PROSECUTOR: | Stubble? |
| S.S.: | Yes, yes, that's how you say it. |

The preliminary hearing transcript also reveals that S.S. never affirmatively testified that Williams was "light-skinned." Rather, Williams seems to place undue emphasis on the following exchange between defense counsel and S.S.:

| | |
|---|---|
| DEFENSE COUNSEL: | Okay. So now, the freckles obviously were a darker color than the rest of his skin on his face, correct? |
| S.S.: | Can you repeat that, please? |
| DEFENSE COUNSEL: | The freckles were a darker color than the actual skin on his face, meaning he might have a light brown face but the freckles were dark brown, is that correct? |
| S.S.: | Yes. |

At the revocation hearing, the district court acknowledged that S.S. might have also meant "freckles" to refer to "acne scars or discolorations," both of which the district court identified on Williams' face in the pictures provided:

> And more to the point, the intake, both the intake photo and the MDOC photo, but one more than the other, carefully viewed, in fact, shows Mr. Williams was having what appeared to me to be acne scars or discolorations on at least one if not both cheeks. Darker spots of pigmentation are visible on either one or both cheeks. And I think that it is entirely understandable that a lay witness would, especially a young one like this at age 14, with let's say not a perfectly formed educated vocabulary, could seize upon the word "freckle" as being indicative of what he saw on the face of the one perpetrator. And so I think that all is additionally supportive of the identification made.

Although S.S.'s in-court identification suffers from some other infirmities, such as his admission that he could not see very well during the incident, we do not find that the district court's line of reasoning amounts to an abuse of discretion.[3]

In any event, even discounting S.S.'s in-court identification and Miah's on-scene identification, the remaining evidence that the district court considered is sufficient to establish Williams' participation in the robberies by a preponderance of the evidence. First, A.T. and Miah provided unqualified in-court identifications of Williams. Second, the police found Williams only a few blocks from the second robbery shortly after it occurred, and Williams was in a vehicle that matched the one described in the first robbery. Third, the police found two long guns around the center console of the front seat compartment of the vehicle—one on the driver's side and one on the passenger's side.[4] Finally, the police found Miah's keys in the front compartment of the vehicle.

Based on this evidence, we conclude that the district court did not abuse its discretion in finding by a preponderance of the evidence that Williams violated a condition of his supervised release by committing armed robberies.

IV.

For the foregoing reasons, we **AFFIRM** the judgment of the district court.

---

[3] Williams also makes a cursory argument that the government utilized a "highly suggestive practice that results in wrongful convictions" by asking A.T. and S.S. to identify Williams for the first time in open court when 25 days had passed since the alleged robberies. Williams does not elaborate as to this argument, and a 25-day lapse in time between the robberies and the in-court identifications, standing alone, does not give us reason to doubt the reliability of A.T.'s or S.S.'s identifications. *See United States v. Hill*, 967 F.2d 226, 230 (6th Cir. 1992) (finding that in-court identification of robber was reliable, even though five years had passed between the incident and trial).

[4] Williams contends that the police officers provided "inconsistent testimony" at the preliminary hearing as to whether Williams was in the driver's seat or the passenger's seat. It is true that one officer testified that it was Bailey who was in the passenger seat. However, both officers testified that Williams was in the front compartment of the vehicle, and all three of the victims identified Williams as the robber who was on the passenger side. Further, it does not appear that the district court's analysis turned specifically on whether Williams was seated on the driver's side or passenger side of the vehicle. Thus, any inconsistency as to the testimony of the officers is immaterial as to whether the government met its burden to demonstrate Williams' commission of the robberies.